**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 25-1454**

———————

CIN DALE 3; JOHN WRIGHT, 1&2; MILLER; BAK; BALL, 1&2; HUGH D. DALE, JR., in his official capacity as Managing Partner,

>     Plaintiffs – Appellants,

v.

PEOPLES BANK CORP.; KIM LIGHTHALL; JOHN OR JANE DOE BANK EMPLOYEES 1-5,

>     Defendants – Appellees.

———————

Appeal from the United States District Court for the Northern District of West Virginia at Clarksburg.  Thomas S. Kleeh, Chief District Judge.  (1:24−cv−00050−TSK)

———————

Argued:  January 29, 2026                                 Decided:  March 9, 2026

———————

Before WILKINSON, WYNN, and BERNER, Circuit Judges.

———————

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Wynn and Judge Berner joined.

———————

**ARGUED:**  Cory L. Carlyle, THOMPSON, COE, COUSINS & IRONS, LLP, Dallas, Texas, for Appellants.  Arie M. Spitz, DINSMORE & SHOHL LLP, Charleston, West Virginia, for Appellees. **ON BRIEF:**  Meredith C. Miller, THOMPSON, COE, COUSINS & IRONS, LLP, Dallas, Texas, for Appellants.  Jordan "Jo" McMinn, DINSMORE & SHOHL LLP, Charleston, West Virginia, for Appellees.

WILKINSON, Circuit Judge:

A plaintiff won a money judgment against Hugh D. Dale, Jr. in Texas state court. When Dale did not pay, the plaintiff tracked down Dale's bank in West Virginia, which turned over the money in Dale's accounts to help satisfy the judgment against him. This suit is Dale's effort to recover the money from his bank.

The effort fails at the outset. Our judicial system relies upon banks to perform a mainly "ministerial" function in the judgment enforcement process. *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 24 (1825). When a bank receives a court document asking it to turn over money from a depositor, it should comply. That Dale's bank complied here means that it respected the rule of law, not that it wronged Dale.

Dale has legitimate ways to challenge the Texas judgment, but suing his bank for being a middleman is not one of them. The court below dismissed this suit for failure to state a claim, and we now affirm.

I.

We begin by describing the West Virginia judgment enforcement mechanisms at issue in this case.

West Virginia, like many states, uses modified versions of old common law writs to enforce money judgments. These mechanisms are "necessary for the perfection of that which was previously done"—the issuance of the judgment itself. *Id.* at 23. Without them, "[c]ourts would be then left with the power to adjudicate, but without the power to enforce their decisions." *Id.* at 10.

2

One such mechanism is a writ of fieri facias, sometimes described as a writ of execution. *Barber v. Barber*, 464 S.E.2d 358, 359 (W. Va. 1995). The writ, which is issued directly by a court, creates a lien on a judgment debtor's personal property and authorizes the sheriff to seize it to satisfy the judgment. W. Va. Code §§ 38-4-5, -6, -8. "[B]y the command of the writ the sheriff is in strictness bound to bring the money into court." *Turner v. Fendall*, 5 U.S. (1 Cranch) 117, 118 (1801).

Another mechanism is a "suggestion." A suggestion is filed by a judgment creditor, not by a court, and initially involves a request rather than a command. W. Va. Code § 38-5-10. The suggestion asserts that a person, such as a bank, may have in his "possession or control personal property belonging to the judgment debtor." *Id.* The court, without needing to verify the suggestion, may then issue a "summons" against the suggested person "requiring such person to answer the suggestion in writing" within twenty-one days. *Id.*; W. Va. R. Civ. P. 69(a). The answer must describe the property of the judgment debtor the person has in his possession. W. Va. Code § 38-5-13.

After the court receives an answer, however, it may convert the judgment creditor's request into a command by issuing an "order" that the person holding the judgment debtor's property "pay the amount so due." *Id.* § 38-5-15. The court's order is enforceable as if it were a judgment of its own. *Id.* § 38-5-16. The person holding the property—like the sheriff enforcing a writ of execution—has no choice but to comply.

Here is the last piece of the puzzle. If the person holding the property prefers not to wait until a sheriff knocks on his door, he may choose "at any time" after receiving the suggestion, but before his answer is due, to simply turn over the property belonging to the

3

judgment debtor. *Id.* § 38-5-14. The choice whether to pay early is his. *Vanscoy v. Neal*, 322 S.E.2d 37, 40 (W. Va. 1984). But West Virginia promises that if he does so, he will be "discharged from any further liability under the execution" and "from all liability whatsoever to the judgment debtor" for the property handed over. W. Va. Code § 38-5-14.

## II.

We turn now to the facts of this case.

## A.

The judgment at issue here is a default judgment obtained by Signal Ventures, LLC in Texas state court against Dale and two of his companies: Drilco Oil and Gas, Inc. ("Drilco") and Drilco 2019 1V2H Drilling Program, LLC. The court ordered Dale and his two companies to pay Signal $703,886.15 in damages.

Signal, upon becoming the judgment creditor, filed a copy of the Texas judgment with the Circuit Court of Calhoun County, West Virginia. This had the effect of making the judgment enforceable in West Virginia "in the same manner as a judgment of any circuit court of" West Virginia. W. Va. Code § 55-14-2. The clerk of the circuit court then issued writs of execution, commanding the county sheriff to seize and sell personal property of the judgment debtors sufficient to satisfy the judgment.

To aid in the enforcement of its judgment, Signal also filed suggestions with the circuit court which indicated that a bank in the state, Peoples Bank, likely had property in its control belonging to the judgment debtors. The clerk of the court duly issued summonses to Peoples Bank ordering it to respond to Signal's suggestions, and it sent Peoples Bank copies of the writs of execution as well for good measure.

After receiving the suggestions and writs of execution, Peoples Bank reviewed its accounts and identified several that appeared to contain property of the judgment debtors. Five are relevant for our purposes. Each of these five accounts had been opened by Dale between 2002 and 2008, and each had a judgment debtor (either Dale or Drilco) listed as an owner. Each also had a co-owner that was not a judgment debtor: Cin Dale 3, John Wright 1&2, Miller, BAK, or Ball 1&2, all of which are partnerships managed by Dale.

Since all five accounts were in the name of at least one judgment debtor, Peoples Bank debited them and sent cashier's checks to Signal. The bank wrote to the circuit court explaining that it had sent the judgment debtors' property in its control to Signal "as per instructions from the Court." J.A. 45, 64. And it wrote directly to Dale and Drilco informing them that it had debited their accounts "[i]n order for us to comply with" "a Suggestion in the Circuit Court of Calhoun County, West Virginia." J.A. 46, 65.

### B.

In May 2024, Cin Dale 3, John Wright 1&2, Miller, BAK, and Ball 1&2 brought this suit against Peoples Bank and several of its employees. Among other claims, they pled negligence and conversion.

According to the partnerships, the five debited bank accounts belonged exclusively to them and not to the judgment debtors. When Dale set up the accounts two decades earlier, he allegedly told the bank to put them in the partnerships' names alone. Instead the bank set them up as joint tenancies between the partnerships and Dale or Drilco, thereby making them vulnerable to execution by Dale and Drilco's future creditors. *See, e.g.,*

5

*Vincent v. Gustke*, 336 S.E.2d 33, 35 (W. Va. 1985). The partnerships believe they lost $107,061.58 here as a result of the bank's mistake. J.A. 10.

The district court dismissed the negligence and conversion claims for failing to state a claim. It found that the negligence claim was untimely and that the conversion claim was implausible because Peoples Bank did nothing more than comply with the suggestion process. The partnerships appealed only the dismissal of the conversion claim.

### III.

The question before us now is whether the partnerships stated a claim for conversion. We consider it de novo, *Sysco Machinery Corp. v. DCS USA Corp.*, 143 F.4th 222, 228 (4th Cir. 2025), asking whether the facts in the complaint, when accepted as true, make the allegation of conversion "plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In West Virginia, conversion is "the exercise of dominion over the personal property of another by a person who has no legal right to do so." *Rodgers v. Rodgers*, 399 S.E.2d 664, 677 (W. Va. 1990). "The term 'no legal right' is equated to a wrongful exercise of dominion." *Id.*

No one contests that the money in the five bank accounts here was the property of the partnerships (although the parties do contest whether it was also the property of Dale and Drilco). Nor does anyone contest that Peoples Bank exercised dominion over the money when it debited the accounts and issued cashier's checks to Signal. We therefore need address only one element of conversion: was Peoples Bank's conduct wrongful?

The partnerships advance two theories of wrongfulness, but both come up short.

6

A.

The partnerships' primary theory is that Peoples Bank acted wrongfully by removing money from accounts it *should have known* did not belong to the judgment debtors. On this theory, the bank's conversion in 2023 was the byproduct of its negligence when it originated the accounts in the wrong names between 2002 and 2008.

As an initial matter, we note that the partnerships did not appeal the district court's dismissal of their negligence claim as untimely. Negligence and conversion are, however, different torts, so it is possible that the actions giving rise to a time-barred negligence claim might also give rise to a separate conversion claim. *See Copier Word Processing Supply, Inc. v. WesBanco Bank, Inc.*, 640 S.E.2d 102, 111 (W. Va. 2006) (emphasizing that separate torts be evaluated separately). Our focus in the conversion context is simply whether the defendant exercised a "distinct act of dominion" that was "wrongful[]." *Miami Coal Co. v. Hudson*, 332 S.E.2d 114, 121 (W. Va. 1985) (quoting *Pine & Cypress Mfg. Co. v. Am. Eng'g & Constr. Co.*, 125 S.E. 375, 375 (W. Va. 1924)). Negligence twenty years ago might be relevant if it shed light on whether the distinct act here was wrongful.

But we are not convinced that the bank's alleged negligence between 2002 and 2008 is relevant here. At the motion to dismiss stage, we accept as true the partnerships' contention that Dale told the bank to originate the accounts exclusively in the partnerships' names. The pleadings nevertheless make clear that Dale personally signed deposit agreements that showed the accounts as having co-owners, and that Dale used the accounts for up to twenty-one years without objecting. Whether or not it was negligent between

7

2002 and 2008, the bank in 2023 had absolutely no reason to believe that accounts listed in Dale's and Drilco's names were anything other than accounts owned by Dale and Drilco.

Having no reason for doubt, Peoples Bank simply complied with the suggestions it received. It identified accounts in the judgment debtors' names, debited them, and sent cashier's checks to the judgment creditor. It then told the circuit court and the judgment debtors exactly what it had done. Its entire course of action was expressly authorized by § 38-5-14 of the West Virginia Code. It would twist the concept of conversion beyond recognition to hold that the bank had "no legal right" to comply with the law in this way or that its compliance was "wrongful." *Rodgers*, 399 S.E.2d at 677.

The partnerships point to the rule of law that "[c]onversion being proved, the plaintiff is entitled to recover irrespective of good or bad faith." *Wholesale Coal Co. v. Price Hill Colliery Co.*, 128 S.E. 313, 315 (W. Va. 1925). This rule, however, does no work for their argument. Conversion requires wrongful conduct which is lacking here. We easily arrive at that conclusion without needing to consider the bank's good faith.

### B.

The partnerships' backup theory is that Peoples Bank acted wrongfully by removing money from the bank accounts without first giving Dale and Drilco a chance to respond to the suggestions. On this theory, the problem is not the fact that the bank debited the accounts but rather the speed with which it did so. Its alacrity "denied" Dale and Drilco, and by extension the partnerships, "their procedural chance to challenge execution on their bank accounts." Opening Br. at 16.

8

As we described above, however, a bank served with a suggestion is not required to wait for a judgment debtor's or account holder's authorization before acting. Instead, it may freely choose "either" of two options: it may (1) "answer the summons and await service of a court order before releasing the property to the clerk or it may [(2)] deliver the property before the return date of the summons." *Vanscoy*, 322 S.E.2d at 40 (describing W. Va. Code § 38-5-10 and § 38-5-14). Here Peoples Bank chose the second option. There is no definition of "no legal right" or "wrongful" that could encompass action taken under direct authorization by West Virginia statute and West Virginia Supreme Court of Appeals precedent. *Rodgers*, 399 S.E.2d at 677.

The partnerships' argument to the contrary does not hold water. They contend their right to challenge a suggestion derives from West Virginia Code § 38-5-10, which provides that "[u]pon a suggestion by the judgment creditor that a person . . . has in the person's possession or control personal property belonging to the judgment debtor, . . . a summons against such person may be issued . . . requiring such person to answer the suggestion in writing and under oath." But the "person" this provision requires "to answer the suggestion" is the bank, not the judgment debtor or a different third party. The entire suggestion mechanism is designed to prompt action from the party that has the judgment debtor's property in its possession.

If it were not already clear from the statutory text, the Supreme Court of Appeals has explained that "none of the provisions in [§ 38-5] expressly require that a judgment debtor be notified of suggestion proceedings." *Sauls v. Howell*, 309 S.E.2d 26, 31 (W. Va. 1983). A statute that does not even provide a judgment debtor notice surely does not

9

guarantee him a right to respond. While the West Virginia courts have held that a judgment debtor possesses certain due process rights in suggestion proceedings, *Vanscoy*, 322 S.E.2d at 40–41, the partnerships have made no due process arguments here.

IV.

For all the foregoing reasons, the partnerships have not stated a claim for conversion. But the problem with this suit is in truth one level deeper: it is a collateral attack upon the Texas judgment.

Banks are ministerial middlemen in the judgment enforcement process, tasked simply with identifying and turning over deposits held in the names of judgment debtors. Our state and federal court systems, which award money judgments every day, rely on banks to perform these routine tasks. So do creditors, whose willingness to extend financing often depends on the knowledge that they can enforce a court judgment at the debtor's bank if all else goes awry. It is not an overstatement to say that bank compliance with suggestions, writs of execution, and other mechanisms of judgment enforcement lies at the foundation of our economy and our rule of law.

If banks were easily subject to suit over these tasks, every judgment debtor would have a back door to challenge his judgment. Our economy and our rule of law would be the victims. West Virginia's decision to absolve from liability against judgment debtors banks that comply with suggestions, *see* W. Va. Code § 38-5-14, is good evidence that it considered this possibility too much to swallow.

Dale and his companies had other methods to accomplish their objectives besides suing their bank, but those methods have not borne fruit. They could, for example, have

10

corrected the names on their bank accounts at any time between 2002 and 2023. They did not. They could also have contested the enforceability of the Texas judgment in West Virginia. They did and lost. *See Drilco Oil & Gas, Inc. v. Signal Ventures, LLC*, No. 23-ICA-492, 2024 WL 5201656 (W. Va. Ct. App. Dec. 23, 2024). Their failure to protect their interests using conventional methods does not now justify this unconventional one.

Because relief is not warranted here, the judgment of the district court is affirmed.

*AFFIRMED*